Mr. Justice MILLER,
with whom concurred Mr. Justice DAYIS, dissenting.
I cannot agree to the judgment of the court, and think the principle involved of sufficient importance to justify an expression of my views.
For many years previous to the late civil war the principal railroads in the State of Missouri had been the objects of the special care of the people, and had received large pecuniary aid from the State. This aid had been given at various times and in divers sums, in the shape of the bonds of the State, to the extent, in the aggregate, of twenty-five millions of dollars or more. For these sums, which were treated as loans, the railroad companies had consented to statutory liens in the nature of mortgages, with conditions to pay the bonds of the State, interest and principal, as they fell due. If the terms of the loan were not precisely as I have stated in all cases, they.wei-e substantially so, and any variations in special instances do not affect the question under consideration.
The State of Missouri was, almost as much as any State in the Union, the seat of the worst calamities of that war. Its people were divided among themselves; regular armies marched and countermarched over its soil, and each side used or abused the railroads to their utmost capacity when within their control. But, above all, the local guerrilla *375 warfare, to which the disputed control of her territory and the divided allegiance of her people subjected them, was the cause of immense destruction and damage of her railroads. These companies, therefore, emerged from the war with their roads in a state of repair which hardly admitted of use, and the rolling stock so deteriorated that new supplies were indispensable. Their credit was low, their means ex* hausted, and their property apparently worth but little. They were unable to meet their obligations to the State, and were largely in arrears for the interest on the State bonds.
The State itself was in little better condition. To the heavy burdens of increased taxation, imposed by the Federal government to support the war and pay its debt, was now added the necessity of paying the interest on the large debt of the State incurred in aid of the railroad companies.
The question forced itself upon the people of the State and the railroad companies, what is to be done in this emergency? The people of the State felt the injustice, in their overburdened condition, of being called on to pay, without aid from the corporations, the debt incurred for their benefit, and this hardship was not diminished by the consideration that the roads were owned and controlled by stockholders, very few of whom were citizens of Missouri. The railroad companies felt that if their roads were to be made capable of accomplishing the purpose of their creation, all their means and all their credit must be devoted to repairing and rebuilding'the roads and refurnishing the rolling stock.
The railroad companies and that part of the people .of the State who felt a stronger interest in the roads appealed to the generosity of the legislature to relieve the roads from the burden of the debt to the State. Those who believed that the credit of the State and the relief of the people from the burden of excessive taxation were of paramount importance thought the State should relieve herself as far as possible by enforcing her lien "at the expense of the stockholders, and by sale of the roads, realize all they would bring, and, appropriating this to the payment of the bonds of the *376 State, diminish to that extent the taxation necessary to pay the interest on her large public debt.
The appeal for leniency to the. railroad companies had many and able advocates, and was warmly urged by them, and assisted by all the appliances which that class of corporations use with so much effect. The legislature had in several instances released liens altogether on some roads, and had postponed liens to let in subsequent ones, thus showing what might be expected of that body.
It was in the midst of the diseussion of this question that the members of the constitutional convention of 1865 were elected, and in the face of the difficulties which it presented that the convention assembled.
They took cognizance of the matter. They understood that they were expected to adopt some plan of relief, and whatever plan was adopted must be based mainly, if not exclusively, on one or the other of the two propositions we have named. We are now called upon to give judicial construction to what they did, and, by all the rules of sound interpretation, it must be done in view of the condition of affairs which their action was intended to relieve and of the public sentiment which they intended to represent.
It was very clear then, it is equally clear now, looking alone to what was incorporated into the constitution by that convention, that it wholly rejected the idea of leniency to the railroad companies, and that its sole care was to conserve the pecuniary interest of the State.
As the constitution stood when the convention assembled it was in the power of the legislature — of any legislature— at any time, under the pressure of any influence, to release the lien of the State on the roads, or to make any other compromise of the claim of the State. If the convention was fully determined against this policy, it was their first duty to take this power from the legislative body altogether. The first thing to be done was to forbid the legislature from granting this relief. In the effort to carry out this purpose the convention placed in the body of the constitution, article IV, section 15, the declaration that “ the General Assembly *377 shall have no power whatever to release the lien held by the State upon any railroad.”
It seems to me strange that this provision should be the subject of a divided opinion as to its meaning. The release here meant could not have been the execution of a technical instrument called a release. No such absurdity can be imputed to the convention, because if the debt was paid, or otherwise discharged, so that the lieu no longer existed, the making of such an instrument was of no value to any one. The thing prohibited was the discharge or remission in any shape of the specific lien which the State had on the roads for the repayment of the bonds she had advanced or loaned to the companies. To make this more emphatic all power whatever on this subject was taken away. No pressing exigency, no motive, however pure or generous, and no consideration even of pecuniary wisdom iu which the legislature might indulge, or believe, was to justify this discharge of the lien which the State held as security for her advances. How can it be maintained in the face of this that while the legislature could not release from motives of grace,.and for the purpose of a gratuity, it could release on a purpose of compromise by accepting one-third or one-half of the debt secured by the lien ? If one-third could be accepted, then one-tenth. If five millions could be accepted when ten were due, then five dollars could be accepted. It is to be borne in mind that we are considering the constitutional power of the legislature to release the lien, and on this question we are not at liberty to consider whether it acted wisely or reasonably. If they could release at all, or for any consideration, the court cannot say they have exceeded their power. But the constitution seems to place all this beyond question by saying it shall not have any power whatever to do this thing.
The work of the convention was, however, to be submitted to a vote of the people. If it received a majority of the votes cast, it became the fundamental law of the land. Otherwise .it passed for nothing. Other propositions were submitted separately, and might be adopted or rejected *378 without hazarding the whole instrument. But so important did the convention deem this provision that they put it into the body of the new constitution, so that the latter could not be adopted without including the former.
If, however, the question of releasing the road from its debt to the State was thus settled in the negative, there still remained the question- of the present enforcement of the lien by sale or otherwise. This question was left by the convention to a vote of the people in a separate ordinance, which might be adopted or rejected without defeating the constitution itself, but which, if adopted, became part of the constitution.
Both the constitution and this ordinance were submitted at the same time, and both were adopted and became part of the fundamental law of the land at the same time. This ordinance throws a flood of light on the intention of the men who framed the constitution in adopting the section we have just discussed. It imposed a tax of ten per cent, on the gross receipts of the three principal roads from October, 1864, to October, 1868, and fifteen percent, thereafter; to be devoted to the payment of the principal and interest of the bonds loaned by the State; and it required that if either of said companies neglected or refused to pay said tax, the General Assembly should provide by law for the sale of that road. The fifth section of this ordinance is as follows:
“ Whenever the State shall become the purchaser of any railroad or other property, or the franchises sold as herein-before provided for, the General Assembly shall provide by law in what manner the same shall be sold for the payment of the indebtedness of the railroad company in default; but no railroad or other property or franchises purchased by the State shall be restored to any such company until it shall have first paid, in money or in Missouri State bonds, or in bonds guaranteed by this State, all interest due from said company, and all interest thereafter accruing shall be paid semi-annually in advance; and no sale or other disposition of any such railroad or other property or their franchises, *379 shall be made without reserving a lien upon all the property and franchises thus sold or disposed of, for all sums remaining unpaid; and all payments therefor shall be made in money or in the bonds or other obligations of this State.”
The manner in which this ordinance was put to the people is significant. The ballot was to be, “Shall the railroads pay their bonds? Yes.” “Shall the railroads pay their bonds? No.” The former was a vote for adopting the ordinance; the latter was a vote against it. It is thus seen that if this ordinance was adopted, both the convention and the people were in earnest in their determination not to release any claim the State had in those companies. The peculiar provision of the aboye section makes this very clear. If the State became the purchaser the legislature should provide for the manner of its resale; hut in no event was it to be restored by resale or otherwise to the company who had owned it until that company had first paid in money, or bonds of the State of Missouri, all the accrued interest due from said company; and all iuterest thereafter to accrue was to be paid in advance semi-annually. It was also provided that no sale or other disposition of such railroad should be made without reserving a lien- upon all the property and franchises thus sold or disposed of for all sums remaining unpaid.
The sale or disposition here spoken of had reference to a sale to other parties than to the defaulting company. And even in that case the ordinance provided that none should be made which did not secure the State for all her liabilities on account of the road. The clause can have no other meaning but this, though it is ably argued that it means such part of the consideration of the new’ sale as may be on credit. But, taking the constitutional provision, the prohibition in the ordinance against a restoration of the roads without payment of what is due, and security for what is to become due, it seems to me hardly to admit of a doubt that in no event was the road to pass from the control of the State without security against any loss by reason of these bonds. But however this may be, the constitutional prohibition *380 against releasing the lien, the provisions of the ordinance for the lev}’ of a severe tax on the gross receipts, the direction for a sale if it was not paid, and the two provisions against restoration to the same company until full payment, indicate to my mind the unmistakable determination of the convention and the people that the companies should, in the language of the prescribed ballot, “pay their bonds,” — pay them in full, — or lose their roads, their property and franchises.
The answer bnade to all this is, that while the legislature could not release the lien they could remit the debt. That while they could not restore the road to the same company after the State had bought it in, they could sell to the company the debt which that company owed the State at any price it chose. That while the State could not release the lien by any legislative act, it could compromise or sell the debt, and thus defeat, destroy, or part with that lien.
It :s said if the convention intended to prohibit the legislature from dealing as it chose with the debt, it could easily have said so, instead of using the word lien. If the convention had said that the legislature shall have no power to discharge the debt without-full payment, it could then be argued with much more force that the lien might be released though the debt could not be touched. On the other hand, so long as the lien remained the debt must remain, for there could be no lien without the debt. It seems to me, therefore, that the convention used the stronger and better term, the one which included both, and which expressed precisely what they meant, namely, that both the debt and the lien of the debt should remain inviolate except by payment. If there could be any doubt of this, the form of submission of the ordinance on which the people voted, that the “ roads should, pay their bonds,” makes it too clear for dispute.
But of what avail are constitutional restrictions of legislative power, or legislative restrictions of municipal power, if they are disregarded by the legislatures and municipalities?
It may be said that there remains to the people the pro *381 tection of tbe courts. But language is at best a very imperfect instrument in the expression of thought, and tbe fundamental principles of government found in constitutions must necessarily be declared in terms very general,, because they must be very comprehensive.
The ingenuity of casuists and linguists, the nice criticism of able counsel, the zeal which springs from a large pecuniary interest, and the appeal of injured parties against the bad faith of the legislatures who violate the constitution are easily invoked, and their influence persuasive with the courts, as they always must be.
And if language as plain as that we have been considering, a purpose so firmly held and clearly expressed is to be frittered away by construction, then courts themselves become but feeble barriers to legislative will and legislative corruption, and the interest of the people, which alone is to suffer, has hut little to hope from the safeguards of written constitutions.
These instruments themselves, supposed to be the peculiar pride of the American people, and the great bulwark to personal and public rights, must fall rapidly into disrepute if they are found to be efficient only for tbe benefit of the rich and powerful, and the absolute majority on any subject will seek to enforce their views without regard to those restrictions ou legislative power which are. used ouly to their prejudice.